IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

NADINE ROPER, )
)
   Plaintiff, )
) No. 13 C 3605
v. )
) Magistrate Judge Sidney I. Schenkier
CAROLYN W. COLVIN, Acting )
Commissioner of Social Security, )
)
   Defendant. )

## MEMORANDUM OPINION AND ORDER[1]

Nadine Roper seeks an order reversing the Commissioner's decision denying her claim for disability benefits, and remanding the case (doc. # 24). Ms. Roper claimed that she was disabled as of February 24, 2009 (R. 12). The ALJ rejected that claim. Although she found that Ms. Roper had multiple severe impairments -- obesity, left eye legal blindness, osteoarthritis, neck and shoulder pain from a prior motor vehicle accident, major depressive disorder with psychotic features, and panic disorder with agoraphobia – the ALJ concluded they did not meet a Listing and did not render Ms. Roper disabled (R. 14-16). The Commissioner has filed a brief asking us to affirm (doc. # 28). For the reasons that follow, we grant Ms. Roper's motion and remand the Commissioner's decision.

I.

From the date of her motor vehicle accident on March 16, 2008, through her last visit on March 10, 2009, with Dr. Lawrence Jackson, her primary care physician, Ms. Roper complained of severe neck and back pain, but radiology reports were mostly normal. She also complained of depression, anxiety, and panic attacks, and her physician prescribed anti-depression and anti-

---

[1] On June 11, 2013, by consent of the parties and pursuant to 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to the Court for all proceedings, including entry of final judgment (doc. ## 7, 8).

anxiety medication (R. 273-77, 283, 287, 295). Ms. Roper further complained of blurred vision, vertigo and paresthesia (R. 249, 252).

At the request of the Social Security Administration ("SSA"), Dr. Robert Adams conducted an all-systems physical consultative evaluation of Ms. Roper on July 9, 2009 (R. 341-48). Ms. Roper reported pain and tingling in her hands, shoulders, knees, ankles and lower back, which made it difficult for her to move and do housework (R. 340-42). Dr. Adams found that Ms. Roper had full strength and mostly normal range of motion and normal gait, but noted that she had pain with range of motion and lifting, and that her obesity affected her ability to walk, twist and bend (R. 344-46). Dr. Adams concluded that due to her pain, Ms. Roper could: frequently lift and/or carry a maximum of ten pounds between one-third to two-thirds of an eight-hour workday (but only upward pulling up to one-third of the day); stand and/or walk for a total of less than two hours in an eight-hour workday; and sit for a total of less than six hours in an eight-hour workday (R. 347). Dr. Adams also pointed out that Ms. Roper had "other impairment-related visual limitations due to left eye blindness" (R. 348). However, the ALJ stated that it was "impossible to provide significant weight" to Dr. Adams's RFC, based on her conclusion that the limitations in Dr. Adams's RFC were contradicted by Dr. Adams's objective findings (R. 21).

On July 14, 2009, Gary Smithson, M.A., performed a psychological evaluation of Ms. Roper, again at the request of SSA (R. 350). Ms. Roper reported experiencing depression for the past five years due to her health problems and her inability to do things she used to be able to do (R. 351). She also reported suffering panic attacks due to the stress of being around people, but she attended church regularly, did some light housekeeping daily and went grocery shopping weekly (*Id.*). She cared for her personal hygiene, but had lost interest in reading and other

2

activities (R. 351-52). Mr. Smithson found that Ms. Roper "presented in a credible manner" (R. 354).

Mr. Smithson observed that Ms. Roper had lowered concentration and energy, moderate levels of anxiety, impaired short-term memory and a somewhat limited range of affect, but she was otherwise alert and articulate with appropriate affect (R. 352-54). He concluded that Ms. Roper was moderately limited in the ability to sustain concentration, to understand and remember, and to engage in social interaction, and he gave her a Global Assessment of Functioning ("GAF") score of 53 (R. 354-55).[2] Mr. Smithson also stated that because "her health problems are exacerbating symptomology of depression and anxiety, prognosis for improvement over the next year or so appears to be somewhat guarded" (R. 355). The ALJ stated that she gave "the greatest weight" to Mr. Smithson's opinion because it was "well supported through objective findings . . . and [wa]s not inconsistent with the weight of the evidence as contained in the balance of the record" (R. 25).

On August 6, 2009, state agency consultant James B. Millis, M.D., assessed Ms. Roper's physical residual functional capacity ("RFC") based on her medical records assembled as of that date (R. 356). He opined that Ms. Roper could occasionally lift and/or carry up to fifty pounds; frequently lift and/or carry up to twenty-five pounds; sit, stand and/or walk about six hours in an eight-hour workday; with unlimited ability to push and/or pull and the ability to frequently climb, balance, stoop, kneel, crouch, and crawl (R. 357-58). Dr. Millis disagreed with Dr. Adams's more restrictive RFC because Ms. Roper had good range of motion, normal musculoskeletal exam and grip strength, and normal gait (R. 362). Dr. Millis's opinion was affirmed by a second agency consultant, Dr. Frank Pennington, on March 29, 2010 (R. 411-15).

---

[2]The GAF score is a numeric scale of 0 through 100 used to assess severity of symptoms and functional level. *Yurt v. Colvin*, 758 F.3d 850, 853 (7th Cir. 2014).

3

The ALJ gave "significant weight" to Dr. Millis's assessment because it was "the most consistent with the record as a whole" (R. 22).

On August 26, 2009, state agency consultant Janice Castles Ed.D, ABPP,[3] completed a psychiatric review technique for Ms. Roper based on the medical record (R. 365-81). She diagnosed Ms. Roper with major depressive disorder and anxiety disorder, but found that Mr. Smithson's diagnosis of panic disorder with agoraphobia was not supported by the record (R. 368, 370, 377). Dr. Castles found mild restrictions in activities of daily living and maintaining concentration, persistence, or pace because Ms. Roper attends church three times a week, goes places alone and shops; and she found moderate restriction in maintaining social functioning because Ms. Roper had moderate trouble interacting appropriately with the general public and carrying out instructions (R. 375-80). Dr. Castles concluded that Ms. Roper could sustain attention for two hour periods in an eight hour day if tasks are limited to simple instructions, and she should be limited to infrequent contact with the public, though she can interact with employees and supervisors (R. 381). These findings were affirmed by another state agency consultant, Horace F. Edwards, Ph.D., on March 18, 2010 (R. 403). The ALJ gave "only limited weight" to Dr. Castles's opinion because she did not examine Ms. Roper (R. 25).

Ms. Roper received treatment from Centerstone Mental Health from September 2009 through August 2010. During her treatment, Ms. Roper reported severe depression and anxiety, not wanting to get out of bed or leave her house, trouble sleeping and concentrating, panic attacks, hearing voices (including Satan's), frequent crying spells, and two prior suicide attempts (R. 420, 423, 428, 432). She was diagnosed with severe depression with psychotic features, panic disorder with agoraphobia, and on intake in September 2009 was given a GAF score of 45 (R. 422, 424). After frequent medication adjustments, her depression and anxiety improved

---

[3]Doctor of Education, American Board of Professional Psychology.

somewhat in early 2010, but by May 2010, her auditory hallucinations and crying spells worsened (R. 432-56, 461-63, 467-74). Centerstone maintained Ms. Roper's GAF score at 45 throughout her treatment there (*see* R. 433, 444, 448, 452, 459, 462, 470, 473). The ALJ found it "curious" that Ms. Roper mentioned psychotic symptoms and suicide attempts for the first time at Centerstone, and did not disclose them during her earlier visit to Mr. Smithson (R. 23). The ALJ referred to Centerstone's treatment notes as "fairly limited," and noted that Ms. Roper missed appointments and was at times non-compliant with her medication (R. 23-24). That said, the ALJ did not state what weight, if any, she placed on the medical evidence from Centerstone.

On May 12, 2011, physician's assistant (P.A.) Stanley King conducted a physical examination of Ms. Roper, upon which he and Volker Winkler, M.D., made an RFC assessment (R. 488). Mr. King observed that Ms. Roper had moderate pain in her right shoulder and neck, joint and muscle tenderness, decreased range of motion, poor muscle strength and muscle spasms (R. 490, 494). Dr. Winkler and Mr. King opined that Ms. Roper could frequently lift and occasionally carry eleven to twenty pounds and occasionally lift twenty-one to fifty pounds but never carry more than that (R. 492). Further, Ms. Roper could only sit, stand or walk for fifteen minutes at a time; and in an eight-hour work day, could only sit for three hours total, stand for one hour total, and walk for thirty minutes total (R. 493). The ALJ stated that she was "unable to provide significant weight" to these conclusions because Mr. King was not an acceptable medical source, and the report relied disproportionately on Ms. Roper's subjective complaints of pain and functional limitations, which the ALJ found were not credible (R. 21-22).

Ms. Roper resumed mental health treatment at the Mental Health Cooperative on July 29 and August 8, 2011, and reported symptoms consistent with those she previously reported to Centerstone except for additional limitations in her daily activities (R. 498, 502). She was again

assigned a GAF score of 45 (R. 499). The ALJ did not give significant weight to the GAF scores at Centerstone or the Mental Health Cooperative because the ALJ stated that they were assessed near the time of intake and thus would be weighted heavily toward her subjective reports, which the ALJ found were of "marginal credibility" (R. 24-25).

On September 16, 2011, John C. Thompson, L.P.C.-M.H.S.P.,[4] examined Ms. Roper and assessed her mental RFC. Ms. Roper reported that she could not focus for any length of time, had poor memory, suffered extreme limitations in all functional areas, and experienced numerous symptoms of anxiety and panic disorder (R. 509-14). Mr. Thompson opined that her depression and schizophrenia were so severe that she could not work, rating all of Ms. Roper's work-related adjustment skills as "Fair" or "Poor/None" (R. 509-11, 514). In his summary remarks, Mr. Thompson wrote that Ms. Roper "lives in a state of 'suicide potential'" (R. 511). The ALJ gave only "minimal weight" to Mr. Thompson's opinion because it was based on only one examination and appeared to rest "substantially, if not exclusively" on Ms. Roper's self-reported symptoms (R. 24-25).

At her hearing before the ALJ on November 9, 2011, Ms. Roper testified that she could not sit for more than about fifteen minutes or stand for more than five minutes at a time because she has bad muscle spasms in her back and her knees sometimes give out (R. 47). She testified that she had constant back, neck, and shoulder pain which she rated as an eight out of ten on average, but which was sometimes so excruciating it felt like a fifteen (R. 49-50). She could not lift a gallon of tea, and her back hurt when she tries to do chores around the house such as washing dishes and sweeping, so she can only do a little bit at a time (R. 49, 51). She no longer attends church frequently because she has severe anxiety around people and noises, and she can only be around groups of people for a few minutes at a time (R. 42-43). She likes to read and

---

[4]Licensed Professional Counselor-Mental Health Service Provider.

watch television, but she has trouble concentrating (R. 44, 59). In addition, Ms. Roper testified that she has attempted suicide twice, once by trying to give herself a heart attack by mowing her lawn, and the second by driving near a river and considering going in (R. 57).

Throughout her opinion, the ALJ stated that Ms. Roper's claims of extreme functional limitations were of "questionable veracity" because she made numerous conflicting statements as to her impairments, radiological testing failed to reveal significant degenerative change or injury, and medical examinations showed normal muscle strength, gait, and movements (R. 19-21). The ALJ noted that Ms. Roper can take care of her personal hygiene, operate a motor vehicle, grocery shop periodically, prepare simple meals, do light housekeeping, handle her finances and follow written instructions, and she regularly attended church (R. 17). Ultimately, the ALJ determined that Ms. Roper had the RFC to perform medium work, but limited her to jobs with "no more than frequent postural activities of climbing, balancing, stooping, kneeling, crouching, and crawling," and unskilled work consisting of simple to detailed tasks with infrequent contact with the general public and requiring adjustment to only simple changes in the workplace (R. 18). Based on this RFC, the ALJ found that Ms. Roper could work at a number of jobs and thus was not disabled (R. 25-26).

## II.

"We review the ALJ's decision deferentially only to determine if it is supported by substantial evidence, which we have described as such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Yurt v. Colvin*, 758 F.3d 850, 856 (7th Cir. 2014) (internal citations and quotations omitted). "Although we will not reweigh the evidence or substitute our own judgment for that of the ALJ, we will examine the ALJ's decision to determine whether it reflects a logical bridge from the evidence to the conclusions sufficient to

7

allow us, as a reviewing court, to assess the validity of the agency's ultimate findings and afford [the claimant] meaningful judicial review. A decision that lacks adequate discussion of the issues will be remanded." *Moore v. Colvin*, 743 F.3d 1118, 1120-21 (7th Cir. 2014) (internal citations omitted).

Ms. Roper raises numerous challenges to the ALJ's opinion. We focus on two grounds that we agree require remand: the ALJ's handling of the evidence concerning Ms. Roper's physical and mental limitations. We address each in turn.[5]

### A.

We begin with the ALJ's handling of the evidence of Ms. Roper's physical impairments. The ALJ's decision gave little or no weight to the opinions of Dr. Adams, P.A. King, and Dr. Winkler, and gave significant weight to Dr. Millis's opinion. The ALJ was required to offer an explanation that built a "logical bridge" between the evidence and that decision. *Moore*, 743 F.3d at 1121. The ALJ's opinion failed to do so in several important respects.

*First*, the ALJ stated that Dr. Millis's opinion was "the most consistent with the record as a whole" (R. 22), but offered no explanation of the basis for that conclusion. Moreover, the fact that Dr. Millis did not examine Ms. Roper should have been a relevant consideration. "[A]n ALJ generally affords 'more weight to the opinion of a source who has examined' a claimant than to the opinion of a source who has not." *Givens v. Colvin*, 551 F. App'x 855, 860 (7th Cir. 2013) (quoting 20 C.F.R. § 404.1527(c)). The weight ultimately given to a non-examining source depends on "its consistency with and objective medical support in the record; the quality of the explanation the source gave for the opinion; and the source's specialization." *Id*. However, the ALJ here gave controlling weight to the opinion of a non-examining source without any additional explanation.

---

[5]As a result, we do not reach the other challenges to the ALJ's opinion that plaintiff raises.

8

*Second*, the ALJ decided that she was "unable to provide significant weight" to the conclusions of two examining sources, P.A. King and Dr. Winkler, because Mr. King was "not an acceptable medical source" and Dr. Winkler's level of involvement was unclear (R. 21-22). While physician's assistants are considered "other medical sources," whose opinions cannot alone establish the existence of a medically determinable impairment, that does not mean they can be summarily disregarded. "[O]pinions of other medical sources are important and should be considered when evaluating 'key issues such as impairment severity and functional effects.'" *Phillips v. Astrue*, 413 F. App'x 878, 884 (7th Cir. 2010) (quoting SSR 06-03p). The ALJ was not entitled to dismiss Mr. King's findings of severe functional limitations simply because he was a physician's assistant. Moreover, Dr. Winkler (an acceptable source) co-signed the evaluation of Ms. Roper, and the ALJ's speculation that Dr. Winkler was minimally involved in Ms. Roper's examination and assessment is not based on any evidence in the record and is thus improper.

*Third*, the ALJ stated that it was "impossible to provide significant weight" to Dr. Adams's conclusion that Ms. Roper was extremely functionally limited because this contradicted his objective findings (R. 21). While Dr. Adams's examination showed that Ms. Roper could perform a range of movements, he noted that she had difficulty due to her obesity and experienced pain from performing these activities. This conclusion did not contradict Dr. Adams's objective findings; to the contrary, it was reasonable for Dr. Adams to opine based on his observations that Ms. Roper's pain increased her physical limitations.

*Fourth*, in explaining her decision to dismiss the opinions of Dr. Adams, Mr. King, and Dr. Winkler, the ALJ pointed (directly or indirectly) to their reliance on Ms. Roper's subjective complaints of pain. However, "[a]n ALJ must consider subjective complaints of pain if a

9

claimant has established a medically determined impairment that could reasonably be expected to produce the pain." *Moore*, 743 F.3d at 1125. Here, the ALJ found that Ms. Roper established that she suffered neck and shoulder pain following her motor vehicle accident (R. 14). While the ALJ's generally low opinion of the credibility of Ms. Roper's testimony is clear, that does not mean that her complaints to medical personnel of pain and limitations over a period of several years is automatically suspect. Indeed, the ALJ did not remark on the assessment of Mr. Smithson, who did a psychological examination at the request of the agency, that Ms. Roper "presented in a credible manner" (R. 354).

For the foregoing reasons, on remand the ALJ must further assess the medical evidence of Ms. Roper's physical impairments and better explain any conclusions she reaches concerning that evidence.

### B.

In assessing Ms. Roper's mental impairments, the ALJ gave "the greatest weight" to Mr. Smithson's opinion from July 14, 2009 (R. 25). The ALJ explained that his opinion was "well supported through objective findings as contained therein, and is not inconsistent with the weight of the evidence as contained in the balance of the record" (R. 25). The ALJ's explanation falls short for several reasons.

*First*, Mr. Smithson's opinion does not take into account extensive evidence of Ms. Roper's mental health. Mr. Smithson wrote his opinion before Ms. Roper began a year's worth of mental health treatment with Centerstone. The ALJ downplayed Ms. Roper's treatment at Centerstone by calling the treatment notes there "fairly limited." However, the record shows that Ms. Roper consistently received treatment at Centerstone (albeit without a perfect attendance record) and struggled through numerous adjustments to her mental health medications. It is well-

settled that an ALJ may not ignore relevant evidence that undermines her conclusion. *See Scrogham v. Colvin*, 765 F.3d 685, 698-99 (7th Cir. 2014). The ALJ did just that by giving controlling weight to a doctor's opinion that preceded significant evidence of mental health treatment.

*Second*, the ALJ selectively used Mr. Smithson's opinion. She disregarded Mr. Smithson's statement that Ms. Roper "presented in a credible manner" (R. 354) and that her physical problems exacerbated her mental health issues of depression and anxiety such that the "prognosis for improvement over the next year or so appears to be somewhat guarded" (R. 355). And, indeed, the subsequent mental health records bear out that prognosis.

*Third*, the ALJ's explanation for her decision to give Ms. Castles's psychiatric opinion "only limited weight" was also deficient. The ALJ stated that Ms. Castles did not directly examine Ms. Roper (R. 25). That explanation does not build a logical bridge to the ALJ's conclusion because she gave significant weight to Dr. Millis's opinion, who also did not examine Ms. Roper.

*Fourth*, the ALJ did not adequately explain her decision to give "minimal weight" to Mr. Thompson's opinion. The ALJ said she discounted that opinion because, in addition to being based largely on Ms. Roper's subjective complaints, it was furnished after a single encounter with Ms. Roper (R. 24). Again, that explanation is insufficient where the ALJ gave "the greatest weight" to the opinion of Mr. Smithson, who also saw Ms. Roper only once.

*Fifth*, the ALJ erred in finding that Ms. Roper's low GAF scores were not entitled to significant weight. The ALJ reasoned that the scores were issued only at intake (at Ms. Roper's initial meeting with mental health professionals) and thus based primarily on her subjective complaints. This misstates the record. As plaintiff points out, she was assigned a GAF score of

45 on multiple occasions, not just upon intake (*see* R. 422, 433, 444, 448, 452, 459, 462, 470, 473, 499).[6] "We recognize that a low GAF score alone is insufficient to overturn an ALJ's finding of no disability. In this case, however, taking the GAF scores in context helps reveal the ALJ's insufficient consideration of all the evidence . . . presented." *Bates v. Colvin*, 736 F.3d 1093, 1099 n.3 (7th Cir. 2013) (internal citations omitted) (regarding failure to consider GAF score of 42). That is true in this case as well.

## CONCLUSION

For the reasons stated above, we grant Ms. Roper's request for remand the ALJ's decision (doc. # 24). The case is remanded for further proceedings consistent with this opinion. The case is terminated.

ENTER:

SIDNEY I. SCHENKIER
United States Magistrate Judge

DATE: November 12, 2014

---

[6]"A GAF score of 41-50 indicates serious symptoms; a score of 51-60 indicates moderate symptoms; and a score in the range of 61-70 indicates mild symptoms." *Farrell v. Astrue*, 692 F.3d 767, 769 (7th Cir. 2012) (citing Am. Psychiatric Ass'n, Diagnosis and Statistical Manual of Mental Disorders 32-34 (4th ed. 2000)). Although the American Psychiatric Association discontinued use of the GAF metric in 2013, the GAF score is relevant in social security appeals after 2013 where it was still in use during the period when the claimant's examinations occurred. *See Yurt*, 758 F.3d at 853 n.2 (citing Am. Psychiatric Ass'n, Diagnosis and Statistical Manual of Mental Disorders 16 (5th ed. 2013)); *see also Williams v. Colvin*, 757 F.3d 610, 613 (7th Cir. 2014) (holding that while the fifth edition of the manual abandoned the GAF scale because of "its conceptual lack of clarity . . . and questionable psychometrics in routine practice," in that case, the ALJ erred by discounting, and in one instance ignoring, the claimant's GAF scores of 45, which were properly based on a "holistic analysis," which included consideration that the claimant's pain and loss of function could exacerbate her mental impairments).

12